## NORTH BRITISH & MERCANTILE INS. CO. v. GREENVILLE COMPRESS CO. et al.

District Court, S. D. Mississippi, W. D. December 21, 1927.

**Equity ⊛17—Equity had jurisdiction of bill by insurer, requiring receipt holders of flooded cotton to file claims and to distribute proceeds, in view of extraordinary conditions.**

Through flood overflow of the Mississippi river 28,000 bales of cotton in a compress, belonging to different owners, were submerged and seriously damaged. Complainant was insurer against flood damage of 20,000 bales with the right, on payment of the loss, to take over the insured cotton. The bales were so soaked and defiled that to a large extent they could not be identified as to the owners, or as to what was and was not insured by complainant. Held, that the extraordinary conditions gave a court of equity jurisdiction, on a bill by complainant and tender of payment of the loss, to take possession of the cotton, which was still under water and subject to further overflows, through its receiver, to sell the same, to be salvaged by the purchaser, to require all receipt holders to file their claims, and to distribute the proceeds of the sale pro rata among those showing themselves entitled to share therein.

In Equity. Suit by the North British & Mercantile Insurance Company against the Greenville Compress Company and others. Decree overruling objections to jurisdiction, and for distribution of fund arising from sale of property by receiver.

On the morning of April 22, 1927, due to a break in the levee on the east bank of the Mississippi river at Stop Landing, just north of Greenville, Miss., the floodwaters of the Mississippi river entered the compress of the Greenville Compress Company to a depth of from 8 to 12 feet. There were in the compress at the time approximately 28,000 bales of cotton. A very strong current was present, and the bales of cotton were washed into the aisles, were floated about in the water, were piled one on top of the other, and approximately 1,000 bales, situated in open sheds, were washed away. The greater portion of the cotton was totally submerged, and the remainder saturated with water.

The North British & Mercantile Insurance Company exhibited its original bill of complaint in the District Court of the United States for the Western Division of the Southern District of Mississippi, at Vicksburg, and alleged that it carried an open policy of insurance against flood waters covering 20,000 bales of cotton in this compress; that other insurers carried insurance on approximately 6,000 bales; that it admitted its liability for the loss and damage to said cotton, and offered to pay the same in full as soon as such loss and damage could be ascertained; that under the terms of the policy, upon ascertainment of the loss and the payment thereof, it had the right to take the property, which it was willing to do. The bill alleged that, owing to the fact that the flood waters of the Mississippi river had entered into the compress, the means of identification of the greater portion of the cotton was destroyed; that upon the payment of its liability it would become the owner of approximately 20,000 bales of cotton, which it would be unable to identify, owing to the fact that the identity of the bales of cotton had become destroyed. It alleged the deterioration which the cotton would suffer from the presence of the flood waters, the necessity that the cotton, at the earliest possible moment, be reconditioned and sold, and the proceeds distributed among all parties concerned on a pro rata basis.

The bill alleged that it was not possible to ascertain the names of the owners of the cotton, since the records of the compress company were submerged in water, but that the remaining 8,000 bales belonged to various and sundry persons, firms, and corporations. The bill alleged that the complainants were without relief, except in a court of equity, and that irreparable injury would be sustained unless a receiver should be appointed and the cotton contained in the compress impounded; that all persons claiming or owning any of the cotton in the compress be brought before the court; that the warehouse receipts for each bale of cotton be required to be filed in court and impounded; that all persons be enjoined from filing actions at law, and be required to intervene in said cause and present their respective claims to the proceeds arising from the sale and disposition of said cotton.

Charles B. Snow of Jackson, Miss., was appointed receiver and took possession of the cotton. Before the waters of the Mississippi river receded, and while the cotton in the compress was still under water, he sold under the orders of the court the 28,000 bales of cotton for approximately $530,000 in cash. The receiver guaranteed that the purchaser should receive 28,000 bales of cotton. The receiver delivered the cotton contained in the compress to the purchaser, and, when the waters receded, recaptured and delivered to the purchaser 1,000 bales of cotton which had been carried by the waters of the Mississippi river from the compress, some of it a distance of five miles.

Publication was made under the orders of the court for all persons owning or claim-

ing an interest in or lien upon the cotton, requiring them to file their warehouse receipts with the clerk of the court and present claims for their pro rata part of the proceeds of the cotton. Service of process was had upon the compress company and upon two of the owners of cotton contained in the compress. All persons were enjoined from taking any action at law on their warehouse certificates.

The complainant, North British & Mercantile Insurance Company, and a number of other companies writing similar policies, filed claims in said suit covering approximately 26,000 bales of the cotton contained in the compress, alleging their liability for loss to the cotton by reason of the flood waters of the Mississippi river, and the fact that they had fully paid and discharged their liability and elected to take the cotton paid for. They filed with their claims in court the warehouse receipts therefor. All of the remaining persons, firms, or corporations owning cotton in said compress, with the exception of O. B. Crittenden and R. B. Campbell, hereinafter referred to, intervened in said cause, propounded their claims for the value of the cotton, and deposited their warehouse receipts with the clerk of the court.

All claims were allowed, based upon the sound value of the cotton as of the day the flood waters of the Mississippi river entered the compress, and the claims of all persons interested, including the complainant insurance company and other insurance companies similarly situated, were presented and allowed upon the same basis. O. B. Crittenden, doing business under the firm style and name of O. B. Crittenden & Co., and R. B. Campbell, of Greenville, Washington county, Mississippi, the former having 756 bales of cotton in the compress, and the latter 119 bales, intervened in said cause and challenged the jurisdiction of the court to appoint a receiver, moved that the order appointing the receiver be revoked and set aside, that the injunction be dissolved, and that the receiver be ordered to deliver to them, and each of them, their cotton, or pay the full value thereof, and that a lien be impressed upon the fund as a preferred claim.

It appeared from the evidence in the case that the cotton contained in the compress, by reason of the flood waters of the Mississippi river, was so intermingled and confused as that possibly from 25 to 40 per cent. thereof was incapable of identification at all, and that which was capable of identification was so commingled with the other cotton in the compress, and sunken in the mud and silt which had drifted into the compress, and so dislocated and situated, as to render identification, segregation, and separation and delivery thereof impracticable and the expense thereof prohibitory. However, each of these claimants did demand of the warehouse company and the receiver, after the flood waters receded, that their cotton be set aside and delivered to them, and they asserted that, even if the court had jurisdiction to appoint a receiver for any of the cotton contained in said compress, it was the duty of the receiver, at his peril, to separate, segregate, and identify every bale of cotton susceptible of identification, and set the same aside to them, if any should be so found. The receiver and the warehouse company each denied that it was their duty under the circumstances to identify, separate, segregate, and deliver to the claimants their cotton, but gave them permission to go into the compress and identify and take out their own cotton, if they so desired.

Watkins, Watkins & Eager, of Jackson, Miss., and R. L. McLaurin, of Vicksburg, Miss., for receiver.

Ernest Kellner, Jr., of Greenville, Miss., represented O. B. Crittenden & Co.'s Claim.

R. B. Campbell, of Greenville, Miss., represented his own claim.

DAWKINS, District Judge. Ordinarily I like to go into an investigation of the law cited in a case of this kind, as well as to give a careful study of the facts, of the evidence that is introduced; but I believe this is a case which warrants me in disposing of it now, with the lights before me, and, if the parties intend to appeal one way or the other, then it may be put on the road to finality by an appeal to the appellate court.

As I see the situation, there was an extraordinary condition presented as a result of the breaking of the levee near Greenville, which submerged the compress at that point, as well as compresses at Leland and Belzoni, involving some 60,000 bales of cotton, upon which the complainant in this case was insurer; the allegations in the petition for the appointment of a receiver setting out that some 20,000 bales were covered at Greenville. The allegations otherwise set up a condition obtaining there of confusion, which disclosed such a commingling of the cotton which was covered by insurance with that which was not, which, if taken as true, would indicate a situation where a court of equity, in my opinion, would be justified in stepping in.

Now, as to the extent of the interest disclosed by the complainant, it is shown, as

I say, that the complainant was the insurer, and that the damage had occurred. It was inescapable that a very large liability under the policies would attach to the complainant in this case, and it was apparently the one in position to take action, because of its greater interest than any one else, and perhaps being in a better condition to finance the undertaking to salvage, and to save from the submerged cotton such portions as were possible. I think the record of that situation, both of pleadings and of proof, establishes such an interest in the complainant as justified it in applying to the court for relief.

After appointing the receiver, and taking charge to such extent as was possible under the physical conditions that obtained at that time, evidently the receiver must have become active in interesting people who would possibly be able to purchase the cotton or to finance its salvage. If he had undertaken under orders of the court and the issuance of certificates to salvage the cotton himself, then we might have had a cross-bill here that would have been much greater than it is. So the reasonable, logical thing for him to have done was just what he did do, and that was to cast about for some one who was in the business, and who could undertake to recover the cotton.

As disclosed by the pleadings and by the applications which were presented to the court for that purpose, those efforts resulted in the obtaining of certain bids upon the cotton in the condition in which it then was—that is, while submerged—which was in a large measure "buying a pig in the poke," because no one could tell, until the water would go down, what the extent of the damage would be. The river might rise as the result of floods, or what not. In a large measure it occurs to me that it was a gamble on the part of those who were willing to buy at that time, and I believe the record does show that the river did make subsequent rises, whether after the sale, or before, I do not recall.

But in any event the evidence discloses, after the water went down, that it was possible to identify somewhere from 25 to 40 or 50 per cent. of some of this cotton—that is, a small portion of it—in warehouse No. 2, which I believe the evidence indicates contained about 4,000 out of 28,000 bales, and that in the other warehouse the percentage was smaller. I think, notwithstanding the proof of the ability to identify the cotton, the evidence reasonably shows that to have undertaken to deliver that portion which was subject to identification in the manner which is contended for would have added to the expense, both upon the cotton that was so delivered, as well as the other thousands of bales that were in the press; that whatever saving might have accrued in price to such portions of the cotton as were not as badly damaged as others would have exceeded any benefit to be attained thereby. In other words, I believe that the court is justified in looking at it from a practical standpoint.

An extraordinary condition, as stated, existed, an unprecedented condition, in which people who theretofore had been dealing in the ordinary and usual course of affairs had put their property in a common warehouse, under circumstances where, without the intervention of these unusual conditions, it could have been readily identified and delivered under the contract. But, once the flood came and conditions disclosed by this record were produced, then it became a question of the best thing for the benefit of all concerned, and I believe the record shows that the course pursued was the best in the interest of all parties.

My conclusion is that the defendants are not entitled to be treated any differently from those of the other persons who had cotton in this compress. Judgment will be entered accordingly.